**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:12-CV-163**

| | | |
|---|---|---|
| FRANCIS ARAYA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **<u>MEMORANDUM AND ORDER</u>** |
| | ) | |
| DEEP DIVE MEDIA, LLC and | ) | |
| GAWKER MEDIA, LLC , | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THIS MATTER** is before the court on a Motion to Dismiss by Defendant Gawker

Media, LLC ("Gawker"), filed on November 8, 2012, pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure, asserting failure to state a claim for which relief can be granted.  (Doc.

6).  This motion was supported by Defendant Gawker's Memorandum of Law in Support of

Motion to Dismiss. (Doc. 7). Plaintiff filed a timely response on November 20, 2012.  (Doc. 8).

Defendant Gawker filed a timely reply on November 27, 2012.  (Doc. 9).

Defendant Gawker's motion, as well as the parties' briefs, will be considered in

reviewing the sufficiency of the complaint.

## I.        Factual and Procedural History

Francis Araya ("Plaintiff"), a recent teenage graduate of Lake Norman High School in

Iredell County, North Carolina, prays for reimbursement for personal injuries and damages as a

result of Defendant Gawker's allegedly libelous speech; punitive damages resulting from the

same; costs; attorney's fees; and a trial by jury. Plaintiff's complaint alleges (1) libel *per se*, (2)

libel *per quod* in the alternative to libel *per se*, (3) libel susceptible to two interpretations in the

alternative of libel *per quod*, and (4) negligent infliction of emotional distress. (Doc. 1-1 at 12–15).

Plaintiff's causes of action arise from the following facts, as alleged in her complaint. *See generally id.* On or around May 25, 2012, Defendants Deep Dive Media, LLC and Gawker published separate news stories on their internet news websites showing a cropped, altered, and partially censored picture of the Plaintiff allegedly exposing her genitals in her high school yearbook. Because only Defendant Gawker has moved for dismissal, the Court will neither relate nor discuss the facts or law surrounding the Deep Dive article. Instead, all that need be considered are the circumstances of Defendant Gawker's ("Defendant") particular piece of journalism.

The headline to Defendant Gawker's story ("the article") read "Female High School Student Accused of Flashing Vagina in Yearbook Photo." (Doc. 1-1, Exh. B at 25–27). For the sake of a comprehensive overview of the factual background, the text is reproduced in its entirety below:

> On page 14 of the Lake Norman High School yearbook there is a photo of a girl lifting her graduation gown and exposing her hooha.
>
> Or so it would seem: A spokeswoman for the Iredell-Statesville School District in North Carolina left open the possibility that what appeared to be the student's "genitalia" was merely her thighs bunched together.
>
> But rather than wait for a backlash to maybe ensue, the school thought to speed up the process by texting the families to "warn them" about the photo, and offer refunds. Shockingly, no one cared.
>
> Not ones to let a manufactured moral panic die out unexhausted, the district vowed to investigate, and take action as necessary.
>
> "I can assure the parents of Iredell-Statesville Schools that I take all complaints very seriously, said the district in a statement. "Our administration began investigating as soon as they were made aware of this complaint. Since the

investigation is not complete at this point, I hesitate to rush to judgment, but let me be clear, there is accountability in I-SS and if action is required it will be taken."

No word on what exactly that means, but WSOC-TV has already put the possibility of child pornography charges to rest by confirming that the girl in the photo was already 18 at the time.

So the sicko families who opted to hold on to the crotchbooks can rest easy in the knowledge that, as sexually depraved as they may be, at least they are not a bunch of degenerate upskirting pedophiles.

*Id.* at 25–26.  Prominently displayed above the article was a still photograph captured from the WSOC-TV (a Charlotte, North Carolina-based ABC affiliate) news footage of the controversy, in which the Plaintiff appeared in her cap and gown—her face and pelvic area, however, had been obscured by black bars. *Id.* Alongside the text, towards the end of the article, Defendant embedded a video link to the original WSOC-TV news footage.  *Id.*

Plaintiff's complaint alleges that the photograph, as altered, deliberately misconstrued the context of the original scene; that she was sitting, not standing as the pictorial evidence might suggest; that she was with a crowd of over one hundred students and did not pose for the picture, nor was she aware it was being taken at that very moment; that she was holding a ceremony program and not lifting her gown; and that, finally, she was wearing a dress and undergarments beneath her graduation gown.  *Id.* at 8.

Sometime before August 9, 2012, Plaintiff gave notice to Defendant, through her counsel, of her displeasure with the article, pursuant to the requirements of North Carolina General Statute § 99-1.[1] (Doc. 2-1 at 2). In the same notice, Plaintiff asked for a retraction of and apology

---

[1] Section 99-1, entitled "Libel against newspaper; defamation by or through radio or television station; notice before action," reads:

(a) Before any action, either civil or criminal, is brought for the publication, in a newspaper or periodical, of a libel, the plaintiff or prosecutor shall at least five days

for the article in question; Defendant declined to acquiesce. *Id.* In a letter dated August 9, 2012, Plaintiff responded to Defendant and provided timely and ample notice of her intention to file suit, along with her reasoning and expected damages.

Subsequent to the publishing of Defendant's story, Plaintiff maintains that she has been harassed, ridiculed, disgraced, publicly scorned and subjected to outright contempt by her community members. (Doc. 1-1 at 10). Furthermore, she alleges that multiple persons have been able to identify her as being the woman pictured on the website, causing her severe emotional distress, extreme humiliation, and irreparable damage to her reputation and dignity. *Id.* "Strangers have ridiculed her and directed inappropriate and sexually explicit propositions and innuendos to [her]." *Id.* at 9. As a result, she has sought psychological treatment and counseling for unspecified emotional distresses. *Id.* at 12.

Due to the aforementioned events and consequences, in addition to Plaintiff's assertion that she was never contacted about the article and that her permission was never requested to publish her photograph, Plaintiff filed the instant action in Iredell County Superior Court on September 20, 2012. (Doc. 1-1). Defendant subsequently removed the action to this Court on the basis of diversity of citizenship jurisdiction and moved to dismiss the claims on November 11, 2012.

## II. Standard of Review

A motion filed per the Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of a complaint, *Jordan v. Alternatives Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006), measured by whether it meets the standards stated in Rule 8 (providing generals rules of

---

before instituting such action serve notice in writing on the defendant, specifying the article and the statements therein which he alleges to be false and defamatory.

N.C. Gen. Stat. § 99-1 (2012).

pleading), Rule 9 (providing rules for pleading special matters), Rule 10 (specifying pleading form), Rule 11 (requiring the signing of pleading and stating its significance), and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted), *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). While a complaint need not contain detailed factual allegations, the courts require more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (applying Rule 8).

"Federal Rules of Civil Procedure 8(a)(2) requires only a 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* (quoting Fed.R.Civ.P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The decisive standard is that the combined allegations, taken as true, must state a "plausible," not merely conceivable, case for relief. *Sepúlveda–Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (citations omitted)). To have facial plausibility—a standard that lies between the outer boundaries of a probability requirement and the mere possibility of unlawful conduct—the pleading must contain factual content that permits the court, using its "judicial experience and common sense," reasonably to infer the defendant's liability. *Id.*

### III.     Analysis and Discussion

Plaintiff has pleaded four causes of action: (1) libel *per se*; (2) libel *per quod* in the alternative to libel *per se*; (3) libel susceptible to two interpretations as an alternative to libel *per quod*; and (4) negligent infliction of emotional distress. *See* (Doc. 1-1).

Defendant has responded with a general denial of all allegations in the complaint, and asserts, specifically, that : (1) "disfavored" causes of action, such as defamation claims, routinely

are held to a stricter standard of pleading—a standard which the Plaintiff does not achieve; (2) the article is protected by the First Amendment to the United States Constitution; (3) the article never identifies Plaintiff by name, face, or circumstance, and thus cannot be "of and concerning" her, thus precluding an action for libel *per se*; (4) supposing the article is "of and concerning" the Plaintiff, whether specific language or actions are capable of a libelous interpretation is a matter of law for the courts to decide and that, in the instant case, Defendant's article was not so capable; (5) Plaintiff's libel *per quod* claim fails because she does not allege special damages; (6) North Carolina courts do not recognize a third class of libel (libel susceptible to two interpretations), and thus any cause of action resting on such theory must fail; and (7) Plaintiff fails to plead the sufficient elements for a claim of negligent infliction of emotional distress. *See generally* (Docs. 7 & 9).

Because of the number and complexity of the issues brought up by the Defendant's motion and accompanying briefs, each issue will be examined in turn in the discussion and analysis below.

### A.  Pleading Standard for Defamation Claims

Defendant boldly alleges that defamation pleadings are held to a higher standard of pleading in the context of 12(b)(6) motions than are other "more favored" causes of action, particularly in the Fourth Circuit. (Doc. 7 at 4–5) ("When a claim is a traditionally disfavored cause of action, such as malicious prosecution, libel, or slander, the courts have tended to construe the complaint by a somewhat stricter standard and have been more inclined to grant a Rule 12(b)(6) motion to dismiss.") (quoting 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed. 2012). For support of this proposition, Defendant cites to a number of cases decided by the Fourth Circuit (and inexplicably a number

of North Carolina decisions applying State procedural rules) in which libel claims were dismissed on a 12(b)(6) motion.  *Id.*  Defendant, however, fails to show just how the particulars of those cases tend to establish the "stricter standard" or just where the distinguishing line of demarcation between the strict standard and an ordinary one should be drawn.  *Id.* The mere recitation of a number of cases that were dismissed at a preliminary stage does not, in itself, create a higher or stricter pleading standard.

To claim so would be to heighten the Plaintiff's pleading standard for virtually all causes of action that have had a number of cases dismissed pursuant to 12(b)(6) motions — a flimsy watermark to be sure.  Instead, the Court agrees with the Middle District of North Carolina's assertion that "the Fourth Circuit has joined with a growing number of courts in concluding that . . . *the Federal Rules do not mandate a heightened pleading standard for defamation cases . . . .*" *Moore v. Cox*, 341 F. Supp. 2d 570, 575 (M.D.N.C. 2004) (emphasis added).

Therefore, the pleading standards as set forth in Part II of this Order, along with the universally accepted and mandatory authorities of *Twombly* and *Iqbal*, adequately and accurately set forth the standard of review to be applied to the sufficiency of Plaintiff's complaint for the purposes of a 12(b)(6) motion to dismiss. *See supra* Part II; *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 679.

### B.  First Amendment Protection of the Media

Media outlet reporting on private individuals necessarily implicates a delicate balance between our closely held right of a free press, on the one hand, and the "maint[enance] [of] the reputation and livelihoods of private individuals who are somehow harmed by the dissemination of this information," on the other. *Neill Grading & Const. Co., Inc. v. Lingafelt*, 606 S.E.2d 734,

741 (N.C. Ct. App. 2005). Naturally, Defendant Gawker would prefer the former interest to control, while the Plaintiff would prefer the latter.

Defendant Gawker argues that the article in question is protected by the First Amendment because (i) the subject matter is of "public concern" and (ii) even false proclamations of fact enjoy insulation from liability under the Constitution. *See* (Doc. 9 at 4) ("Here there can be no doubt that the constitutional 'of and concerning' requirement applies because a *controversy about student behavior in school is a matter of public concern*."); (Doc. 9 at 2) ("[S]peech does *not* forfeit the protections afforded by the First Amendment simply because the speaker knows that his statements are false.").  Plaintiffs disagree.  (Doc. 8 at 13–15).

i.    **Public vs. Private Controversy**

The Supreme Court has expressly condoned our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). *New York Times* settled the issue on the freedom of the press to report—sometimes erroneously so—on the circumstances surrounding matters of public debate. *Id.* at 271–72 ("[] [E]rroneous statement is inevitable in free debate, and [] it must be protected if the freedoms of expression are to have the breathing space that they need to survive . . . .") (internal quotations and citations omitted).

Defendant would have this Court rest the issue on the *New York Times* First Amendment protection of public debate and be done with it, yet the issue here is not so straight forward. *New York Times*, as the Supreme Court later established quite clearly, is applicable only when the victim is allegedly libeled in his or her "official capacity." *Id.* at 273; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) ("[W]e conclude that the state interest in compensating

injury to the reputation of private individuals requires that a different rule [than the *New York Times* rule] should obtain with respect to them."). Plaintiff in the instant case is an eighteen year old student; she is decidedly *not* a public official. Defendant, however, continues to urge application of the *New York Times* privilege on grounds that Plaintiff's photo (and the controversy it stirred) is implicitly a "matter of public concern." (Doc. 9 at 4).

This argument seems necessarily to rely on the Supreme Court's *Gertz v. Robert Welch, Inc.* dichotomy of public/private individuals: "[A] private individual whose reputation is injured by defamatory falsehood that *does concern an issue of public or general interest* has no recourse *unless he can meet the rigorous requirement of New York Times*." *Gertz*, 418 U.S. at 346 (emphasis added). Some courts have found this category of individual—a private individual wrapped up in a public controversy—to be a "limited purpose public figure," and this Court understands Defendant to classify Plaintiff as such. (Doc. 9 at 4) ("[P]laintiff admits that she became the subject of public scrutiny. . . .") (internal quotations omitted); for cases utilizing the "limited purpose public figure" standard, *see Gaunt v. Pittaway*, 534 S.E.2d 660, 665 (N.C. Ct. App. 200); *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6, 13 (1st Cir. 2011).

The Fourth Circuit has approached the determination of whether an individual is a "limited purpose public figure" in two distinct ways, evolving over time to become a more refined process. First, the Fourth Circuit has applied a two-part test as established by the Supreme Court:

> [T]he Court developed a two part-part inquiry for determining whether a defamation plaintiff is a limited-purpose public figure. First, was there a particular '*public* controversy' that gave rise to the alleged defamation? Second, was the nature and extent of the plaintiff's participation in that particular controversy sufficient to justify 'public figure status'?

*Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1552–53 (4th Cir. 1994) (emphasis in orginal) (applying *Gertz*, 418 U.S. 323; *Time, Inc. v. Firestone*, 424 U.S. 448, 453–55 (1976); *Hutchison v. Proxmire*, 443 U.S. 111, 134–36 (1979); and *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164 (1979)). Then, if the first question is answered in the affirmative, the Fourth Circuit has created a five-part legal test to determine the answer to the second question above. *See Foretich*, 37 F.3d at 1555–56 (referencing *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 708–11 (4th Cir. 1991), *and Fitzgerald v. Penthouse Intern, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982)).

These steps have ramifications on the instant case in two potentially dispositive ways in determining whether Defendant may assert First Amendment protection. First, if the matter is not an issue of public concern as defined by current case law, the Defendant is in error when asking for the same rigorous First Amendment protections as *New York Times*. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986) ("When the speech is of exclusively private concern and the plaintiff is a private figure . . . the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape."). Second, however, if the subject matter *is* a matter of public concern, this court must still find, as a matter of law, that Plaintiff was a "limited purpose public figure" at the time of publication in order for the Defendant to claim First Amendment protection at the level prescribed in *New York Times*. *Foretich*, 37 F.3d at 1552 ("Further extending the *New Yorks Times* actual-malice standard [to private individuals] would serve only to . . . undermine the very freedom of speech in whose name the extension is demanded. . . . [W]e foster both the individual interest in self-expression and the social interest in the discovery and dissemination of truth—the very goals that animate our First Amendment jurisprudence.").

Courts routinely have had a difficult time ascertaining at the first step what, exactly, constitutes a "public controversy." *See Foretich*, 37 F.3d at 1554 ("*Gertz* provided no express definition of a public controversy."); *Firestone*, 424 U.S. at 454 ("But in doing so petitioner seems to equate 'public controversy' with all controversies of interest to the public."); *Rosenblum v. Metromedia, Inc.*, 403 U.S. 29, 43 (1971) ("If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved . . . ."), *abrogated by Gertz*, 418 U.S. 323 (1974), *and overruling recognized by Firestone*, 424 U.S. 448, *and Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999).

Over time, this circuit has expressly adopted the definition set forth by the United States Court of Appeals for the District of Columbia Circuit:

> A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way.... [E]ssentially private concerns or disagreements do not become public controversies simply because they attract attention.... Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.

*Foretich*, 37 F.3d at 1554 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980)). While providing a modicum of further detail on which to draw an inference of public or private classification, this definition is still inherently vague. For a proper determination by this Court, the instant controversy must be viewed against the context of established case law and prior courts' evaluations of this standard in practice.

Defendant urges as dispositive the determination made by the Fourth Circuit in *Hugger v. Rutherford Institute*. 94 F. App'x 162, 167 (4th Cir. 2004). Without a doubt, so says the Defendant, "a controversy about student behavior in school is a matter of public concern." (Doc 9 at 4). Reliance on *Hugger*, however, is sorely misplaced and distinguishable on multiple grounds. First, in *Hugger*, the controversy was not about *student* behavior, as the Defendant

asserts, but instead about the actions of a public school teacher and principal. *Id.* at 164. Thus, the *New York Times* privilege is immediately implicated in such a case because the victims allegedly defamed are unquestionably public officials acting in their official capacities, whereas here, the *student* is not a public official. *N.Y. Times Co.*, 376 U.S. at 270. Second, Defendant relies on the case for the proposition that, despite not being about the actions of a public official, the instant action is in regard to behavior in public schools, thus implicating a "matter of public concern." (Doc. 9 at 4). Yet *Hugger* found its public controversy to be a matter of public concern precisely *because* the individuals in question are *public officials*: "[T]he public undoubtedly has a strong interest in the classroom *conduct, or misconduct as the case may be, of elementary school teachers and administrators*." *Hugger*, 94 F. App'x at 167 (emphasis added). The *Hugger* court goes on to say that even that much is not a guarantee of a public controversy: "We do not mean to imply that every publication concerning a teacher or school administrator will necessarily relate to a matter of public concern." *Id.* So, not only does the Defendant misapply the facts of the *Hugger* case in calling it a matter of student behavior, but it misstates the holding as well, assuming that *all* publications dealing with school behavior are matters of public concern. Surely, if not even all actions by *public officials* are of public concern, fewer actions of public school *students* will be of public concern; thus, the holding of the *Hugger* court has little, if any, relevance to this case. The Court must look elsewhere for guidance.

The Court, therefore, turns its attention to *Time, Inc. v. Firestone*, one of the more oft-cited cases regarding public controversies. *Firestone*, 424 U.S. 448. In that case, the Supreme Court chided Time, Inc. for erroneously conflating "all controversies of interest to the public" with the constitutional definition of a "public controversy." *Id.* at 454. As the Court points out, the two are quite different. To so conflate, the Court said, would be to reinstate the already

"repudiate[d]" "doctrine advanced . . . in *Rosenblum v. Metromedia*, which concluded that the

New York Times privilege [sic] should be extended to falsehoods defamatory to private persons

whenever the statements concern matters of general or public interest." *Id.* (referencing

*Rosenblum v. Metromedia, Inc.*, 403 U.S. 29, 43 (1971) ("If a matter is a subject of public or

general interest, it cannot suddenly become less so merely because a private individual is

involved . . . ."), *abrogated by Gertz*, 418 U.S. 323 (1974), *and overruling recognized by*

*Firestone*, 424 U.S. 448, *and Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999)).

      The Defendant, in the opinion of this Court, makes a similar, if not identical, presumptive

logical fallacy.  Defendant, in its only other explicit reference to the issue, cursorily proclaims

that, "Indeed, plaintiff admits that she became the subject of public scrutiny as a result of the

controversy over her yearbook photo." (Doc 9 at 4) (internal quotations omitted).  Evaluated

against the backdrop of *Firestone*, such argument carries little weight. *Firestone*, 424 U.S. at

454.  The *general* circumstance of being the subject of public scrutiny does not suffice for the

*legal* standard of "public controversy." *Id.*  Instead, "a public controversy is a dispute that in fact

has received public attention because its ramifications will be felt by persons who are not direct

participants." *Foretich*, 37 F.3d at 1554 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d

1287, 1296 (D.C. Cir. 1980)). Thus, to qualify as a public controversy and, in turn, to mandate

consideration of the second step of the "limited purpose public figure" test, this Court must

consider whether the article held ramifications for persons who are not direct participants.

      This Court finds in the negative. In balancing the *curiosity* of the public against the

potential *effect* on the public, the D.C. Circuit, as cited with approval by the Fourth Circuit, has

crafted a spectrum against which cases should be judged: on the one end are public policy issues

affecting a genuine public controversy; on the other are "lurid personal matter[s] that capture[]

only the voyeuristic attention of the people." *Foretich*, 37 F.3d at 1555 (4th Cir. 1994) (quoting

*Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099, 1107 (D.C. Circuit 1991)

[hereinafter *Advance Magazine*]). These are the parameters within which Defendant's article

must be evaluated.

Thus, the issue is whether Defendant's article implicated sufficient concerns with public

policy to rise to the level of public controversy, or if it tended to pander more to the "lurid,"

"voyeuristic attention of the people." *Id.* The Court has little difficultly in deciding this matter.

The article lured readers to the website with a sensational headline focused on "Flashing

Vagina[s]" and leads off with two entries: (1) a blacked out picture altered to suggest a partially

nude teenager and (2) a description of the picture as being that "of a girl lifting her graduation

gown and exposing her hooha." (Doc. 1-1 at 25). The article itself scoffs at the social value of

the controversy, calling it a "*manufactured* moral panic" and suggests that there would have been

no controversy had not school officials blown it out of proportion. *Id.* (emphasis added).

Repeated references to teenage genitalia, "hoohas," "crotchbooks," and "upskirting pedophiles,"

coupled with a censored photograph of a young female, all tend to suggest a comedic and

"voyeuristic" journalistic approach lacking in substance on the pressing policy issues of the day.

*Id.*

Therefore, this Court finds that the article in question concerns a private individual

involved in a private, not public, controversy. As such, the First Amendment protection by way

of public controversy that Defendant relies on is inapplicable, and the North Carolina common

law interpretation of libel will be applied to the case at bar. *See Philadelphia Newspapers, Inc. v.

Hepps*, 475 U.S. 767, 775 (1986) ("When the speech is of exclusively private concern and the

plaintiff is a private figure . . . the constitutional requirements do not necessarily force any

change in at least some of the features of the common-law landscape."). Because there is no need to proceed to the second step of the Supreme Court's two-part test to determine whether *New York Times* First Amendment protection applies, the Court will now consider whether false statements are protected by the First Amendment.

### ii. False Proclamations of Fact Under the First Amendment

Defendant also claims First Amendment protection for its article under the more recent findings of the Supreme Court in *United States v. Alvarez*. 132 S. Ct. 2537 (2012) (determining that notwithstanding notable exceptions, false speech is protected by the First Amendment). This specific argument is in response to the Plaintiff's claim that "Defendant's speech is not protected by the First Amendment because it is false." (Doc. 1-1 at 13–15). Specifically, Defendant believes that *Alvarez* "squarely rejects" this contention, because the *Alvarez* Court "concluded that speech does *not* forfeit the protections afforded by the First Amendment simply because the speaker knows that the statements are false." (Doc. 9 at 2) (referencing *Alvarez*, 132 S. Ct. at 2545) (Kennedy, J., plurality opinion).

Again, the Defendant is mistaken in its reliance on such case law. The Court need not elaborate on why Defendant's assertion is patently inappropriate for the instant case, other than to point out that *Alvarez* was not dealing with a libel or infliction of emotional distress action. *Alvarez*, 132 S. Ct. at 2542 ("Respondent was indicted under the Stolen Valor Act for lying about the Congressional Medal of Honor at [a] meeting."). Instead, *Alvarez* internally comments on the inapplicability of its ruling to defamation and libel cases in numerous examples, *directly refuting* the Defendant's reading of the case: "Instead, content-based restrictions on speech have been permitted, as a general matter, only when confined to the few historic and traditional categories of expression long familiar to the bar. Among these categories are . . . *defamation* . . .

." *Id.* at 2544 (internal citations omitted). In other words, the *Alvarez* opinion itself says, in plain language, that its finding has no relevance to defamation suits. *Id.* This is a defamation suit. First Amendment protection, therefore, is not applicable to the article if the statements are indeed false. *Id.*

The concurrence to *Alvarez* also rather neatly distinguishes the plurality's holding from claims relating to the infliction of emotional distress cases: "I . . . must concede that many statutes and common-law doctrines make the utterance of certain kinds of false statements unlawful . . . . Torts involving the intentional infliction of emotional distress . . . concern falsehoods that tend to cause harm to a specific victim . . . ." *Id.* at 2553–54 (Breyer, J., concurring). While the case at bar involves a claim for negligent infliction of emotional distress, not intentional, Justice Breyer's concurrence also points out that the unlawful behavior recognized as the "tort [of] placing a victim in a false light" is also an accepted limitation on the right of free speech in regard to false statements; it is notable that the standard of fault for such a tort is negligence. *Id.*; *Bell v. Nat'l Republican Cong. Comm.*, 187 F. Supp. 2d 605, 617 (S.D.W.V. 2002) (recognizing that false light invasion of privacy of a private individual requires only a showing of negligence). Because it is accepted doctrine that false statements that harm a plaintiff in a tortious way—even when the standard of fault is merely negligence—are not protected by the First Amendment, the Court finds that *Alvarez* protection does not extend to NIED claims.

Therefore, this Court does not believe that the First Amendment protects false statements in libel or infliction of emotional distress cases concerning private plaintiffs and private controversies. Coupled with its previous finding that there is not specific First Amendment protection of the article on the basis of a public controversy, this Court finds that there is no

heightened or special First Amendment insulation that the Defendant may invoke in the instant case. *See supra* Part II.B.ii. As a result, the libel and negligent infliction of emotional distress causes of action will be evaluated under the traditional North Carolina common law standards.

## C. Libel

Plaintiff pleads a cause of action under three different theories of libel: libel *per se*, libel *per quod*, and libel susceptible to two different interpretations. Defendant moves for dismissal on a number of purported defects in the complaint: (i) the article in question is not "of and concerning" the Plaintiff, which is an indispensable element to any libel claim; (ii) whether something is libelous is a determination of law to be made by the Courts, and in the instant case, such a determination cannot be made on the pleadings; (iii) Plaintiff's libel *per quod* claim must fail because she did not sufficiently allege special damages; and (iv) North Carolina does not recognize "libel susceptible to two interpretations" as a valid cause of action, and therefore, such cause of action must fail. Each element of Defendant's motion will be considered in turn to determine whether Plaintiff has sufficiently stated a complaint upon which relief may be granted, always keeping in mind *Iqbal*'s warning about facial plausibility. *See supra* Part II; *Iqbal*, 556 U.S. at 679.

### i. "Of and Concerning"

That defamatory words "must refer to some ascertained or ascertainable person and that [the] person must be the plaintiff" is so ingrained a universal principle of common law libel that it is beyond dispute. *Arnold v. Sharpe*, 251 S.E.2d 452, 456 (N.C. 1979). This principal is more commonly and succinctly referred to as the "of and concerning" element. *N.Y. Times Co.*, 376 U.S. at 716–17. Defendant maintains that the Plaintiff's identity is not explicitly revealed in the article, nor is her personage ascertainable from the facts offered in its text; thus, "her libel claims

should be dismissed for this reason alone." (Doc. 7 at 7). There is no doubt that if the Plaintiff's pleading does not allege a certain set of facts that would plausibly lead a jury or court to find that she is the ascertainable subject of the allegedly defamatory words, then dismissal under a 12(b)(6) motion is appropriate.

Defendant first supports its argument—that the article does not directly identify the Plaintiff—by reference to the North Carolina Supreme Court decision in *Arnold v. Sharpe*. *Sharpe*, 251 S.E.2d 452. *Sharpe* applied its own version of the "of and concerning" language in finding that a generalized and ambiguous set of statements, without further detail or identifiers, could have referred to any number of employees at the office in which the plaintiff in that case worked. *Id.* at 539. Defendant, in citing to the case, conveniently leaves out the very next sentence from its reasoning: "If the words used contain no reflection on any particular individual, no averment can make them defamatory." *Id.* In other words, these allegedly defamatory statements could have adequately referred to multiple people. In the instant case, the Court does not understand the Defendant to maintain that any number of people other than the Plaintiff were accused of "Flashing [their] Vagina[s]" or "exposing [their] hooha[s]." (Doc. 1-1 at 25). Because the article clearly alludes to the actions of a "particular individual," and also because the Plaintiff's complaint states as much, the Court does not find the reference to *Sharpe* to be instructive.

Defendant next cites to a line of defamation dismissals that all involve large groups. *See Chapman By and Through Chapman v. Byrd*, 475 S.E.2d 734, 737 (N.C. Ct. App. 1996) (dismissing claim by nine restaurant employees against county for alleging that an unidentified employee had contracted AIDS because the words were not about one individual in particular); *Pack Bros. Body Shop, Inc. v. Nationwide Mut. Ins. Co.*, 2003 WL 21017395, at *6 (N.C. Super.

2003) (dismissing defamation claim because allegedly defamatory statements about body shop were not "of and concerning" owner of shop with same name); *Arcand v. Evening Call Publ'g Co.*, 567 F.2d 1163, 1165 (1st Cir. 1977) (dismissing defamation claim where statement referred to one unidentified member of group of twenty-one); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1016 (3d Cir. 1994) (dismissing defamation claim where reference to ten wallpaper dealers as "pirates" was not "of and concerning" one individual dealer); *Abramson v. Pataki*, 278 F.3d 93, 102–03 (2d Cir. 2002) (dismissing defamation claim where repeated references to "Javits Center workers" failed to satisfy "the essential element of specific reference" to individual workers); and (Doc. 7 at 7–8) (for a more comprehensive list).

These cases, however, are immediately distinguishable from the instant case. First, in *Byrd*, the dispositive issue was that there was no concrete way in which the defendant had adequately described one particular individual from the group as having contracted AIDS, merely that it was one of nine individuals; here, Plaintiff was clearly isolated by cropping the larger photograph to include one person, and one person only, who could be identified by following the article's instructions to view to the unaltered, uncensored photograph. *Byrd*, 475 S.E.2d at 737. Second, *Pack Bros. Body Shop* concerned statements made about a larger entity as a whole and never alluded to a specific individual, while this case involves statements pertaining to one individual and one individual only. *Pack Bros. Body Shop*, 2003 WL 21017395, at *6. Third, *Arcand* dealt with a group of plaintiffs filing suit for defamation of only one of the group; this is simply not the case here, as Plaintiff is the sole litigant alleging defamatory statements made against her and her alone. *Arcand*, 567 F.2d at 1165. In fact, the *Arcand* court specially noted that if the particular individual from that group that had been allegedly defamed had filed suit by himself or herself, regardless of the strength of the claim, the case would have proceeded.

*Id.* at 1164 ("[W]hile discounting the defamatory nature of the statement, . . . it was probably libelous *if it could be held to refer to a particular individual*.") (emphasis added). And finally, both *Alvord-Polk* and *Abramson* suffer from the same distinction as *Pack Bros. Body Shop*: the defamatory statements concerned a collective group of individuals wherein no individual personage was specifically defamed, whereas the instant case involves an alleged defamatory statement about "a [*single*] girl lifting her graduation gown and exposing her hooha." *See Alvrod-Polk*, 37 F.3d at 1016; *Abramson*, 278 F.3d at 102–03; (Doc. 1-1 at 25).

Defendant asserts that the application of the foregoing cases is appropriate because the photo to which the article directs the reader's attention contains "more than a hundred students," and therefore the "group-based" reasoning applies. What Defendant ignores is that the photograph accompanying the article has only *one* student. It is as though the article puts a red circle around the Plaintiff within the larger group to which Defendant refers, and thereby differentiates and negates any "group-based" argument. This Court finds that graphically isolating one individual from a group of a hundred, coupled with textual and syntactical references to that individual alone, is a sufficiently plausible basis for the "of and concerning" element of a libel claim to survive a 12(b)(6) motion to dismiss.

Defendant next contends that the identity of the Plaintiff is "not ascertainable" per the requisite demands of *Sharpe*; that, particularly, "plaintiff's identity cannot be ascertained by referring to a page in a yearbook." *Sharpe*, 251 S.E.2d at 539; (Doc. 7 at 8). Defendant cites to a Kentucky appellate level decision dealing with what it contends is a similar situation. *Combs v. Knott Count Publ'g Co.*, 2004 WL 2413579 (Ky. Ct. App. 2004); (Doc. 7 at 11). In *Combs*, a student's picture was published along with an article about provocative behavior by teenagers at the school prom. *Combs*, 2004 WL 2413579, at *1. The article accused a general population of

students of engaging in "sex with clothes on." *Id.* The plaintiff in *Combs* was pictured alongside the article wearing a revealing skirt and exposing an inappropriate amount of her body; her face, however, was entirely blacked out. *Id*. Defendant claims the instant case is factually identical; that this Court should follow the Kentucky Court of Appeals, a tribunal whose edicts are not binding on this Court, in deciding that dismissal would be appropriate because, like in *Combs*, Plaintiff's face was blacked out.

Here, however, the facts are different. *Combs* dealt with a general statement about students, not an article about the behavior of the lone person pictured. *Id.* Moreover, in *Combs*, the only person who reasonably knew the picture pertained to a particular and identifiable individual was the plaintiff herself. *Id.* In the instant case, Defendant provided a precise roadmap for readers to view the unaltered and uncensored picture, thus completely negating any slight value achieved by blacking out the face of the Plaintiff. (Doc. 1-1 at 25) ("On page 14 of the Lake Norman High School yearbook there is a photo of a girl . . . ."). The Defendant then proceeds to isolate precisely which girl it is referring to by providing a photograph of the Plaintiff and no one else. The Court fails to see how the Defendant can possibly claim that a reader who views the original, uncensored photograph from the Lake Norman High School yearbook—to which the article clearly and immediately directs the reader's attention—could not readily ascertain the Plaintiff's face when comparing the original to the cropped picture provided with the article.

Due to the reasons stated above, this Court finds that Defendant's article is plausibly "of and concerning" the Plaintiff, and that her identity was plausibly "ascertainable" for the purposes of a 12(b)(6) motion. The Plaintiff has alleged as much in her complaint, maintains that individuals *have in fact* ascertained her identity, and, as such, sufficiently satisfies the "of and

concerning" element. (Doc. 1-1 at 7–10, ¶¶ 20–25). Because the question of "of and concerning" has long been held to be an issue of material fact in North Carolina, this Court finds sufficient factual allegations pleaded to proceed to a jury for determination. *See Hundell v. Eureka Lumber Co.*, 45 S.E. 532, 533 (N.C. 1903) (upholding trial court's decision to ask the jury whether allegedly libelous statements were "of and concerning" the plaintiff).

### ii. Libelous Capabilities as a Matter of Law

Defendant also contends that whether a statement is potentially libelous is a matter of law for the Court to decide, and that in this case, the Court should find in the negative. (Doc. 7 at 9). As to the assertion that libelous capability is a matter of law in North Carolina, the Defendant is partially correct: libel *per se* is to be determined as a matter of law, while libel susceptible to two interpretations is a matter strictly reserved for the jury. *Compare Flake v. Geensboro News Co.*, 195 S.E. 55, 62 (N.C. 1938) ("But defamatory words to be libelous per se must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace . . . ."), *with Sharpe*, 251 S.E.2d at 455 ("In an action upon [publications susceptible of two interpretations one of which is defamatory and the other not], it is for the jury to determine . . . ."). Likewise, libel *per quod*, so long as special damages have been pled, is an issue appropriate for jury consideration: "[Jury] instructions on . . . libel *per quod* . . . would have been appropriate in this case had they been properly alleged in plaintiff's complaint." *Ellis v. Northern Star Co.*, 388 S.E.2d 127, 134 (N.C. 1990).

Because only libel *per se* is considered a matter for the courts to decide in North Carolina, the Court will now consider, as the Defendant urges, whether the article is capable only of a libelous reading *per se*. The rubric for deciding such a reading under state common law is well-established:

It may be stated as a general proposition that defamatory matter written or printed, or in the form of caricatures or other signs may be libelous and actionable per se, that is, actionable without any allegations of special damage, if they tend to expose plaintiff to public hatred, contempt, ridicule, aversion, or disgrace and to induce an evil opinion of him in the minds of right thinking persons and to deprive him of their friendly intercourse and society.

In order to be libelous per se, it is not essential that the words should involve an imputation of crime, or otherwise impute the violation of some law, or moral turpitude, or immoral conduct. . . . But defamatory words to be libelous per se must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt, or ridicule, or cause him to be shunned and avoided. The imputation must be one tending to affect a party in a society whose standard of opinion the court can recognize.

The general rule is that publications are to be taken in the sense which is most obvious and natural and according to the ideas that they are calculated to convey to those who see them. The principle of common sense requires that courts shall understand them as other people would. The question always is, How would ordinary men naturally understand the publication? The fact that supersensitive persons with morbid imaginations may be able, by reading between the lines of an article, to discover some defamatory meaning therein is not sufficient to make it libelous.

*Flake*, 195 S.E. at 60 (internal citations omitted).

In the instant case, Plaintiff places much emphasis on the article's accusation that "there is a photo of a girl *lifting her graduation gown* and exposing her hooha." (Doc. 8 at 10) (emphasis added) ("*Regardless of what Gawker Media alleges [Plaintiff] did or did not expose*, the story still makes the false and damaging factual assertion that [Plaintiff] lifted her gown.") (emphasis in original). In other words, Plaintiff alleges that the false accusation that she actively lifted her gown for the purpose of a photograph is sufficient to be libelous *per se*. For the following reasons, this Court agrees.

Defendant counters that "fairly read, the Gawker article reports that questions have arisen concerning *whether* the yearbook depicts a girl exposing her genitals." (Doc. 9 at 5) (emphasis in original). Further, it contends that Plaintiff, in her brief, ignores the article's statement that

school authorities had not dismissed the possibility that the photograph showed "merely her thighs bunched together" and not her "genitalia." *Id.* What Defendant does not address is that this information still does not disavow that Plaintiff was "lifting" her gown; the photograph clearly shows that Plaintiff is holding onto some sort of program, and not the edges of her gown. Thus, it is the opinion of this Court that the article imputes but one possible interpretation which is never internally refuted in the article: that Plaintiff *actively* exposed whatever was underneath her graduation gown—whether it be her genitalia, undergarments, or "thighs bunched together"—by intentionally lifting her gown.

The photograph, as the complaint alleges, confirms that this accusation is an outright falsehood. The question for this particular issue then becomes: Does the accusation that Plaintiff *actively* exposed her inner thigh area, regardless of what such exposure revealed, "tend to disgrace and degrade the party or hold [her] up to public hatred, contempt, or ridicule, or cause [her] to be shunned and avoided[?]" *Flake*, 195 S.E. at 60. In other words, is the imputation that Plaintiff simply "flashed" her undergarments (the least damaging possible variation of the article's allegation) sufficiently contemptuous to the "ordinary" man? *Id.* The answer is yes. No person would be thought well of in modern society exposing his or her undergarments, on purpose, at a highly public, esteemed, and well-photographed event such as a graduation. A fair interpretation by the ordinary person would arrive at the conclusion that such an individual was disrespectful of the decorum demanded by societal norms, and perhaps was purposefully seeking attention for his or her behavior.

This evaluation, in the opinion of the Court and "understand[ing] the [implications] as other people would," is sufficiently plausible to—at the very least— "hold the [Plaintiff] up to public ridicule." *Id.*. This is all the North Carolina common law definition of libel *per se*

demands, and therefore this Court finds that the article is *capable* of a libelous interpretation as a matter of law, and is therefore appropriate to be presented to and argued by both parties before a jury for determination. *Renwick v. News and Observer Pub. Co.*, 312 S.E.2d 405, 409 (N.C. 1984) ("If the court determines that the publication is subject to only one interpretation, it then is for the court to say whether that signification is defamatory. [If] . . . both of these questions is [answered in the] affirmative . . . such cases should be submitted to the jury on a theory of libel *per se.*").

Because at least *one* of the statements made in the article is plausibly capable of a defamatory meaning *per se*, this Court finds that Plaintiff's complaint which states, "Considered alone, this publication tends to subject [Plaintiff] to ridicule . . .," is sufficiently pleaded to survive a 12(b)(6) motion to dismiss as to her claim for libel *per se*. (Doc. 1-1 at 12, ¶ 41).

### iii.    Libel *Per Quod* and Special Damages

In the alternative to a libel *per se* claim, Plaintiff pleads libel *per quod*. (Doc. 1-1 at 12, pt. IV). Defendant asserts in its motion to dismiss that this claim must fail because libel *per quod*, according to North Carolina law, requires a pleading of special damages. (Doc. 7, pt. C). Further, Defendant contends that Plaintiff has not done so because she pleads special damages in the way of medical costs for treatment of her emotional distress, and that such costs, specifically, are not special damages under state common law. *Id.*

Libel *per quod* is defined by North Carolina law as a "publication[] not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become[s] libelous." *Sharpe*, 251 S.E.2d at 455. Moreover, "In publications which are libelous

Per quod [sic], the innuendo and special damages must be alleged and proved." *Id.* Defendant does not challenge that the article may fulfill the first part of the definition—that explanatory circumstances, innuendo, or colloquium may turn the article libelous—and instead challenges only Plaintiff's pleading of special damages. (Doc. 7, pt. C).

Specifically, Defendant claims, "Special damages require a pecuniary loss," and, "Damages arising from emotional distress and mental suffering do not constitute a pecuniary loss." *Id.* at 12. Regarding the former assertion, the Defendant is correct; regarding the latter, it is mistaken. First, North Carolina courts have routinely held that a pecuniary loss is a prerequisite for special damages to be alleged. *See Johnson v. Bollinger*, 356 S.E.2d 378, 384 (N.C. Ct. App. 1987) ("In order to prove special damages from defamation, plaintiff's allegations must evidence a pecuniary loss rather than simple humiliation."); *see also Moore v. Cox*, 341 F. Supp. 2d 570, 574 (M.D.N.C. 2004). In doing so, the Plaintiff pleads in her complaint, specifically:

> Defendant Gawker's publication caused Plaintiff to suffer special damages, including but not limited to the cost of treatment and counseling for psychological damages stemming from the ridicule, contempt, public scorn, disgrace, and humiliation, which arose as a result of Defendant Gawker's publication.

(Doc. 1-1 at 12, ¶ 45). As Defendant Gawker correctly asserts, "Emotional distress and mental suffering are not sufficient allegations to establish a basis for relief in cases which are only actionable *per quod.*" *Johnson*, 356 S.E.2d at 384–85.

Defendant, however, takes this to mean that, "The *cost* of treatment and counseling for psychological damages does not constitute a pecuniary loss under North Carolina law because they [sic] *arise* from alleged emotional distress." (Doc. 7 at 12) (emphasis added) (internal quotations omitted). This strained reading goes too far. Defendant relies on three cases in principal: *Johnson, Moore* and *Williams v. Rutherford Freight Lines, Inc.*. (Doc. 7, pt. C); *Johnson*, 356 S.E.2d 378; *Moore*, 341 F. Supp. 2d 570; *Williams v. Rutherford Freight Lines,*

*Inc.*, 179 S.E.2d 319. In all three of these cases, though, the court only goes so far to posit that *allegations* of emotional distress and mental suffering, by themselves, do not evidence a pecuniary loss. *Johnson*, 356 S.E.2d at 384–85 ("Emotional distress and mental suffering are not sufficient *allegations* to establish a basis for relief . . . .") (emphasis added); *Moore*, 341 F. Supp. 584 ("To prove special damages from defamation, a plaintiff's *allegations must evidence a pecuniary loss rather than simple humiliation*.") (emphasis added); *Williams*, 179 S.E.2d at 324 ("[E]motional distress and mental suffering are *not alone sufficient* to establish a basis for relief in cases which are actionable only Per quod [sic].") (emphasis added).

Defendant makes the unjustifiable leap to conclude that, because *allegations* of emotional distress, humiliation, or mental suffering do not afford special damages status, *pecuniary loss in the form of costs* "arising" from such allegations do not qualify, either. This is an illogical and inaccurate presumption, as North Carolina case law recognizes. Instead, it is clearly established under North Carolina precedent that "medical care and expense" are included in special damages. *Tallent v. Blake*, 291 S.E.2d 336, 340–41 (N.C. Ct. App. 1982). Specifically, *Tallent* identifies the validity of medical costs for emotional problems, directly refuting Defendant's theory: "[P]laintiff testified that she suffered *worry*, loss of sleep, *and emotional problems* that led her to go to the doctor. . . . *Special damages include* illness sufficient to require medical care and expense.") *Id.* (emphasis added); *see also Bell v. Simmons*, 101 S.E.2d 383, 387 (N.C. 1958) ("It is noted that plaintiff both alleged and offered evidence tending to show that she *had suffered special damages, to wit, illness sufficient to require medical and hospital care and expense.*"). It should be noted, especially, that *Tallent* allows special damages to include medical care and costs for emotional problems, despite citing the exact passages on which Defendant relies: "In the law of defamation, special damage means pecuniary loss. Emotional distress and humiliation

alone are not enough to support a claim actionable *per quod*." *Tallent*, 291 S.E.2d at 340. This proves, dispositively, that there is a distinction under North Carolina law between generalized allegations of emotional problems and quantifiable pecuniary loss arising from the emotional problems—the latter being acceptable as special damages.

Therefore, this Court finds that Plaintiff did sufficiently plead special damages in relation to her libel *per quod* claim, and that, accordingly, it survives the Defendant's 12(b)(6) challenge to that particular claim.

### iv. Libel Susceptible to Two Interpretations under North Carolina Law

Finally, Plaintiff pleads a cause of action for libel susceptible to two interpretations. (Doc. 1-1 at 12, pt. VIII). Defendant, however, in a footnote, briefly denies the vitality of such a freestanding claim for relief: "Plaintiff also asserts a claim for 'libel susceptible to two interpretations,' which properly is analyzed as a libel *per quod* claim." (Doc. 7 at 5, n.1). Defendant's intimation is that, because libel *per quod* incorporates a "libel susceptible to two interpretations" claim, any such separate claim should be dismissed as a matter of law. For support, all that Defendant cites is one case, in relevant citation claiming: "If a statement is subject to two interpretations, one of which is not defamatory, then it is not libelous *per se*." *Id.* (quoting *Griffin v. Holden*, 636 S.E.2d 298, 3030 (N.C. Ct. App. 2006). But this conclusion does not exclude the possibility of an independent claim of "libel susceptible to two interpretations." The Court will briefly state accepted North Carolina case law that recognizes "libel susceptible to two interpretations."

The following North Carolina cases—many of which the Defendant inexplicably cites elsewhere with approval—explicitly identify *three* classes of actionable libel: *Ellis v. Northern Star Co.*, 388 S.E.2d 127, 129–30 (N.C. 1990) ("North Carolina has long recognized three

categories of libel: (1) . . . libels per se; (2) publications which are susceptible of two reasonable interpretations . . . (3) . . . libel per quod."); *Tyson v. L'Eggs Products, Inc.*, 351 S.E.2d 834, 840 (N.C. Ct. App. 1984) (same); *Cathy's Boutique, Inc. v. Winston-Salem Joint Venture*, 325 S.E.2d 283, 285 (N.C. Ct. App 1985) (same); *Renwick*, 312 S.E.2d at 408 (same); *Arnold v. Sharpe*, 251 S.E.2d 452, 455 (N.C. 1979) (same); *Flake v. Greensboro News Co.*, 195 S.E. 55, 59 (N.C. 1938) (same).

The Court finds Defendant's argument to be unpersuasive. Therefore, Plaintiff's claim for libel susceptible to two interpretations is an actionable claim in support of which she has stated sufficiently plausible facts upon which relief may be granted.

### D.  Negligent Infliction of Emotional Distress

Plaintiff has also pled a cause of action for negligent infliction of emotional distress ("NIED"). (Doc. 1-1 at 13, pt. IX).  As a remedy for Defendant's alleged NIED, Plaintiff asks for punitive damages. *Id.* pt. X.  North Carolina requires that, "To make out a claim for negligent infliction of emotional distress, a plaintiff must allege that the defendant was negligent, that it was foreseeable to the defendant that his negligence would cause the plaintiff severe emotional distress, and that the conduct, in fact, caused severe emotional distress." *Holleman v. Aiken*, 668 S.E.2d 579, 591 (N.C. Ct. App. 2008) (internal citations, quotations, and alterations omitted). Defendant maintains that "Plaintiff does not, and cannot, plead the essential elements of a negligence claim." (Doc. 7 at 13, pt. III).

As to the first element in an NIED claim, actual negligence, it is undisputed that Plaintiff must establish a legal duty owed her by the Defendant. *Guthrie v. Conroy*, 567 S.E.2d 403, 410 (N.C. Ct. App. 2002) ("Negligence is the breach of a legal duty owed by the defendant that proximately causes injury to the plaintiff."). The two breaches of a legal duty which Plaintiff

alleges, as far as the Court can infer, are that Defendant (1) "failed to attempt to discover the truth of the story" and (2) "[f]ailed to retract, apologize for, or remove from the websites the stories at issue after receiving Plaintiff's Notice pursuant to N.C.G.S. § 99-1 . . . ." (Doc. 9 at 13–14). Defendant counters by alleging that "Gawker owes no duty to the Plaintiff." (Doc. 7 at 13).

This Court disagrees with the Defendant. North Carolina courts long ago held that a "Good Faith and Retraction" statute does, in fact, create a duty on behalf of the Defendant: "If the defendant desired to avail itself of the provisions of this statute *it was its duty* to publish an apology and retraction as prescribed by statute." *Roth v. Greensboro News Co.*, 6 S.E.2d 882, 887 (N.C. 1940) (citing ch. 557 P.L.1901, C.S. § 2430, now codified in North Carolina General Statutes as §§ 99-1, -2).  Plaintiff complied with § 99-1 of the state's general statutes, thus notifying Defendant of a potential tortious action on her behalf. *See* N.C. GEN. STAT. § 99-1(a) (2012) ("Before any action . . . is brought for the publication, in a newspaper or periodical, of a libel, the plaintiff . . .  shall at least five days before instituting such action serve notice in writing on the defendant, specifying the article and the statements therein which he alleges to be false and defamatory.").

This notification created a legal duty, pursuant to North Carolina law, for the Defendant to either confirm the truth of the article and stand by its validity, or to print an apology and retraction. By not printing a retraction after Plaintiff's request for the explicit reasons upon which this lawsuit is based, it is, as a matter of law, established that Defendant "should have known the probable consequences of [its] act," thus satisfying the standard for "ordinary negligence." *Clayton v. Branson*, 613 S.E.2d 259, 265 (N.C. Ct. App. 2005).

Therefore, whether the initial publication of the article was negligent is immaterial; failure to print a retraction after Plaintiff requested one is sufficient to satisfy a breach of a legal

duty for which "every person shall be held responsible for the abuse" of the "freedom of the press." N.C. CONST. art. I, § 14. Thus, the Plaintiff adequately stated a claim of negligence for which the law plausibly may provide a remedy in her complaint.

The second element she must satisfy in her complaint is that the breach "was reasonably foreseeable to cause plaintiff severe emotional distress." *Johnson*, 395 S.E.2d 85, 97 (N.C. 1990). Plaintiff's complaint alleges that "Defendant[] could reasonably foresee that such stories would cause Plaintiff severe emotional distress," and that publication through "mass-media . . . in reckless disregard of the rights of [Plaintiff], a young girl who lives, works, and attends college in the Lake Norman area . . . are widespread and severely damaging to her reputation, dignitary interests, and over-all well-being." (Doc. 1-1 at 13–14). Thus, Plaintiff has recited the second element of an NIED claim quite well, but 12(b)(6) motions require "more than a formulaic recitation of a cause of action's elements." *Twombly*, 550 U.S. at 545.

The issue, instead, is whether such a claim has facial plausibility. *Iqbal*, 556 U.S. at 679. Because of the age of the Plaintiff, the widespread nature of the Defendant's media reach, the vulnerability of private individuals in the press, the embarrassing nature of the facts as represented, and the notice of falsehood provided by the Plaintiff to the Defendant, this Court finds such a claim to have facial plausibility. Therefore, the second element of Plaintiff's NIED claim is stated with sufficient factual heft to provide facial plausibility for a grant of relief.

Defendant also denies that Plaintiff has sufficiently pled the third element—that Defendant's conduct, in fact, caused severe emotional distress. *Johnson*, 395 S.E.2d at 97. North Carolina case law, as correctly recognized by the Defendant, "define[s severe emotional distress] as any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition

which may be generally recognized and diagnosed by professionals trained to do so." *Pierce v. Atlantic Group, Inc.*, 724 S.E.2d 568, 577 (N.C. Ct. App. 2012). In the *Pierce* case, merely claiming "serious on and off the job stress" was insufficient. *Id.* There was no mention of "severe emotional distress" in that pleading. *Id.* Likewise, in *Holleman v. Aiken*, as cited by the Defendant, Plaintiff "[did] not make any specific factual allegations as to her 'severe emotional distress.'" *Holleman v. Aiken*, 668 S.E.2d 579, 591. Plaintiff in this case, however, alludes to "treatment and counseling for psychological damages," "severe emotional distress," and "severe[] damag[e] to her . . . well-being." (Doc. 1-1 at 12–14).

The question, therefore, is whether these factual assertions—taken as true for purposes of reviewing the sufficiency of the complaint—are sufficient to overcome a 12(b)(6) motion to dismiss. The answer, in this Court's opinion, is, "Yes." In light of the *Pierce* court's ruling, all that is required is a facially plausible factual allegation of "any emotional or mental disorder . . . which may be generally recognized and diagnosed by professionals trained to do so." *Pierce*, 724 S.E.2d at 577. Taken as true, this Court must find that the factual allegation that Plaintiff has received "treatment and counseling for psychological damages," must necessarily be a psychological—or "emotional or mental"—disorder which has been "recognized by a professional trained to do so." (Doc. 1-1 at 12); *Pierce*, 724 S.E.2d at 577. Whether that factual assertion is true is an issue of material fact that must be determined by a jury or the court at a later stage in the proceeding; for the purposes of a motion to dismiss, however, it will suffice. *Chapman By and Through Chapman v. Byrd*, 475 S.E.2d 734, 740 (N.C. Ct. App. 1996) ("In their NIED claims, plaintiffs allege . . . that [they] suffered severe emotional distress, mental anguish, and ridicule as a proximate result of the statements. We hold these allegations are sufficient to satisfy the pleading requirements . . . and that the trial court therefore erred by

dismissing plaintiffs' NIED claims.") (applying North Carolina substantive and procedural law). It could very well be that the doctors who treated the Plaintiff have no substantive backing for such a claim; but the possibility that they do, coupled with the factual assertion that they have treated the Plaintiff prior to bringing this action, is enough to "nudge[] [the plaintiff's] claim across the line from conceivable to plausible." *Id.* at 570. This is enough to survive and advance to pre-trial discovery, where many of the Plaintiff's factual assertions will be put to the test.

Therefore, all three elements of a plausible NIED claim have been sufficiently pled by the Plaintiff in order to overcome a 12(b)(6) motion to dismiss.

### IV.    Conclusion

"A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.   The Court here does not estimate the likelihood of recovery, but against this standard of review, and for the foregoing reasons, the Court hereby finds that: (1) there is no heightened pleading standard for defamation claims as recognized by the Fourth Circuit; (2) the article in question concerned a private individual involved in a private controversy; (3) *New York Times v. Sullivan* First Amendment protection is not available to the Defendant; (4) the First Amendment does not protect defamatory false statements; (5) the article in question is sufficiently "of and concerning" the Plaintiff to be presented to a jury for determination; (6) it is plausible that—as a matter of law—the article is sufficiently capable of a libelous *per se* reading to be presented to a jury; (7) North Carolina law recognizes medical costs for treatment of emotional distress to qualify as a pecuniary loss for the purpose of "special damages"; (8) "libel susceptible to two interpretations" is a valid and separate cause of action under North Carolina law; and, finally, (9) the Plaintiff has sufficiently pleaded the three *prima facie* elements of a

negligent infliction of emotional distress claim with plausible factual allegations to support such claim.

Therefore, this Court finds that the Plaintiff's complaint has sufficiently, and in its entirety, stated a claim upon which relief may be granted under a number of plausible legal theories.  As such, the Defendant's 12(b)(6) motion to dismiss is <u>denied</u>.

**V.     Order**

**IT IS THEREFORE ORDERED**, that Defendant's Motion to Dismiss pursuant to Rule 12(b)(6) is hereby **DENIED**.

Signed: August 20, 2013

Richard L. Voorhees
United States District Judge